David S. Casey, Jr. (SBN 060768)
*dcasey@cglaw.com*
Gayle M. Blatt (SBN 122048)
*gmb@cglaw.com*
Jeremy Robinson (SBN 188325)
*jrobinson@cglaw.com*
Wendy M. Behan (SBN 199214)
*wbehan@cglaw.com*
Ethan T. Litney (SBN 295603)
*elitney@cglaw.com*
Alyssa Williams (SBN 310987)
*awilliams@cglaw.com*
**Casey Gerry Schenk
Francavilla Blatt & Penfield, LLP**
110 Laurel Street
San Diego, California 92101
(619) 238-1811 phone
(619) 544-9232 fax

Attorneys for Plaintiff

# United States District Court

## Southern District of California

| | |
|---|---|
| **Gaurav Sharma** and **Baily Brownell**, individually, and on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**Volkswagen AG**; **Volkswagen Group of America, Inc.**; **Audi AG**; **Audi of America, LLC**; **Dr. Ing. h.c. F. Porsche AG**; **Porsche Cars of North America, Inc.**; **Daimler AG**; **Mercedes-Benz USA, LLC**; **Mercedes-Benz U.S. International, Inc.**; **Mercedes-Benz Vans, LLC**; **Bayerische Motoren Werke AG**; and **BMW of North America, LLC**,<br><br>Defendants. | Case No.  '17 CV 1678 MMA JLB<br><br>**Class Action Complaint and Complaint for Damages**<br><br>**Demand for Jury Trial** |

CLASS ACTION COMPLAINT

Plaintiffs Gaurav Sharma and Baily Brownell, acting on behalf of themselves and all others similarly situated, bring this action for damages and equitable relief against defendants Volkswagen AG, Volkswagen Group of America, Inc., Audi AG, Audi of America, LLC, Dr. Ing. h.c. F. Porsche AG, Porsche Cars of North America, Inc., Daimler AG, Mercedes-Benz USA, LLC, Bayerische Motoren Werke AG, and BMW of North America, LLC (collectively, "Defendants" or the "German Auto Cartel").

1.    Competition is the cornerstone of our free market economy. Competition between firms benefits individual consumers and society as a whole, as market participants are incentivized to outdo their competitors. In theory, this keeps prices low and drives technological innovation. Competition is so important to our free market economy that a network of laws on the federal and state level protect it. Within each industry, competitors are expected to vie for customers through innovative technology, distinguishing luxuries, and price, among others. The auto industry is no different—or at least it's not supposed to be.

2.    Despite repeated public affirmations in favor of competition by their respective CEOs, German automakers—Daimler, Volkswagen, BMW, and their subsidiaries, including Audi and Porsche—have been colluding for decades in a variety of anti-competitive ways, including by agreeing to limit the maximum speed at which soft-top convertibles can be opened and by agreeing to limit the size of urea tanks in diesel-engine cars. These agreements freed up time and capital for the German Auto Cartel while allowing them to charge consumers a premium for their products without the burden and expense of competitive innovation.

3.    According to a *mea culpa* letter by Volkswagen to governmental cartel authorities in Europe, the conspiracy dates back to 1990s, spanning

dozens of cooperative working groups and thousands of meetings.[1]

4.    German periodical *Der Spiegel* first broke the news of the massive conspiracy on July 21, 2017, concluding that "Daimler, BMW, Audi, Porsche and Volkswagen no longer compete with one another. Instead, they secretly cooperate, very closely, in fact, in the same way one would normally expect of the subsidiaries of a single company to work together, as something **like a 'German Cars Inc.'—or a cartel**."[2]

5.    As a result of the German Auto Cartel's anticompetitive and unlawful conduct, Plaintiffs and the Class paid unfairly inflated prices for their vehicles. The Cartel's activities substantially affected interstate trade and commerce in the United States, causing injury to Plaintiffs and the Class.

## PARTIES

### Plaintiff Gaurav Sharma

6.    Plaintiff Gaurav Sharma is a resident of San Diego, CA. Plaintiff Gaurav Sharma purchased a new Mercedes C230, model year 2006, from Mercedes Benz of South Bay in Torrance, CA. Subsequently, he purchased a certified pre-owned BMW X5, model year 2008, from Santa Monica BMW. Each time, Mr. Sharma chose his vehicle because he expected unparalleled quality and reliability from the premium luxury brands.

### Plaintiff Baily Brownell

7.    Plaintiff Baily Brownell is a resident of San Mateo, California. She

---

[1] As written in the official English language translation. Frank Dohmen and Dietmar Hawranek, translated by Christopher Sultan, "The Cartel: Collusion Between Germany's Biggest Carmakers," *Spiegel Online*, July 27, 2017, http://www.spiegel.de/international/germany/the-cartel-collusion-between-germany-s-biggest-carmakers-a-1159471.html. All cites in this Complaint will be to the English language version.

[2] *Id.*

leased a 2017 Volkswagen Jetta from Serramonte Volkswagen in Colma, California on or about June 11, 2017. Ms. Brownell selected a Jetta because she expected a reliable and efficient automobile, and in part because she expected great value and improved performance from a company that had recently weathered such a major scandal. It did not occur to her that Volkswagen's "Clean Diesel" cheating was only the tip of the proverbial iceberg.

**The Volkswagen, Audi, and Porsche defendants**

8.      **Volkswagen AG**: Volkswagen AG ("VW AG") is a German corporation with its principal place of business in Wolfsburg, Germany. VW AG is one of the largest automobile manufacturers in the world, and is in the business of designing, developing, manufacturing, and selling automobiles. VW AG is the parent corporation of VW America, Audi AG, and Porsche AG. Those three, together with defendants BMW AG and Daimler AG, have been known as the German Five. The term is something of a misnomer now, in light of VW AG's acquisitions of two of the five.

9.      According to VW AG, it sold 10.14 million cars worldwide in 2014 – including 6.12 million VW-branded cars, 1.74 million Audi-Branded cars, and 189,849 Porsche-branded cars. Combined with its other brands, VW AG boasts a 12.9% share of the worldwide passenger car market. VW AG's sales revenue in 2014 totaled €202 billion (approximately $221 billion) and sales revenue in 2013 totaled €197 billion (approximately $215 billion). At €12.7 billion (approximately $13.9 billion), VW AG generated its highest ever operating profit in fiscal year 2014, beating the previous record set in 2013 by €1.0 billion (approximately $1.1 billion).

10.     VW AG engineered, designed, developed, manufactured, and distributed the Class vehicles in concert with the other defendants and in contravention of established free market principles. VW AG also developed, reviewed, and approved the marketing and advertising campaigns designed

to sell the Class Vehicles.

11.    **Volkswagen Group of America, Inc.**: Volkswagen Group of America, Inc. ("VW America") is a New Jersey corporation with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171. VW America is a wholly-owned subsidiary of Volkswagen AG, and it engages in business, including the advertising, marketing and sale of Volkswagen automobiles, in all 50 states. In 2014 alone, VW America sold 552,729 vehicles from its 1,018 dealer locations in all 50 states, including 95,240 TDI® "clean" diesel vehicles.

12.    **Audi AG**: Defendant Audi AG is a German corporation with its principal place of business in Ingolstadt, Germany. Audi AG is the parent of Audi of America, LLC and a subsidiary of the Audi Group, which is a wholly owned subsidiary of Volkswagen AG. Audi AG directly controls and directs the actions of Audi of America, LLC. Audi AG designs, develops, manufacturers, and sells luxury automobiles. According to Audi AG, the Audi Group sold more than 200,000 vehicles in the United States in 2015.

13.    **Audi of America, LLC**: Defendant Audi of America, LLC ("Audi America") is a Delaware limited liability company with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171. Audi America is a citizen of Delaware and Virginia. See 28 U.S.C. § 1332(d)(10). Audi America is a wholly owned United States subsidiary of Audi AG, and it engages in business, including the advertising, marketing, and sale of Audi automobiles, in all 50 states.

14.    **Dr. Ing. h.c. F. Porsche AG**: Dr. Ing. h.c. F. Porsche AG ("Porsche AG") is a German corporation with its principal place of business located in Stuttgart, Germany. Porsche AG designs, develops, manufacturers, and sells luxury automobiles. Porsche AG is a wholly-owned subsidiary of VW AG. According to Porsche AG, it sold 187,208 cars worldwide in 2014, with sales

revenues in 2014 totaling €17.2 billion (approximately $18.8 billion). Porsche AG's operating profit in fiscal year 2014 was €2.79 billion ($2.97 billion).

15.    Porsche AG developed its cars in part in concert with the remaining defendants, and exported its vehicles with the understanding that they would be sold in the United States. Porsche AG also developed, reviewed, and approved the marketing and advertising campaigns designed to sell its Class Vehicles.

16.    **Porsche Cars North America, Inc.**: Porsche Cars North America, Inc. ("Porsche America") is a Delaware corporation with its principal place of business located at 1 Porsche Drive, Atlanta, Georgia 30354. Porsche America is a wholly-owned U.S. subsidiary of Porsche AG, and it engages in business, including the advertising, marketing and sale of Porsche automobiles, in all 50 states. According to Porsche AG, it sold 47,007 automobiles in 2014. Porsche America now maintains a network of 189 dealers nationwide.

**The BMW defendants**

17.    **Bayerische Motoren Werke AG**: Defendant Bayerische Motoren Werke AG ("BMW AG") is a German holding company and vehicle manufacturer. BMW AG is headquartered in Germany. BMW AG, together with its subsidiaries, develops, manufactures, and sells cars and motorcycles worldwide, including the German Luxury Vehicles at issue that were purchased throughout the United States, including this district during the Class Period.

18.    **BMW North America, LLC**: Defendant BMW North America, LLC is a Delaware limited liability corporation with its principal place of business in Woodcliff Lake, New Jersey. BMW of North America is the United States importer of BMW vehicles.

CLASS ACTION COMPLAINT

### The Daimler defendants

19.    **Daimler AG**: Defendant Daimler AG is a German corporation with its principal place of business in Stuttgart, Germany, and is the parent company of Mercedes-Benz USA, LLC (which acts as the sole distributor for Mercedes-Benz vehicles in the United States). Daimler AG designs, develops, manufactures, distributes and sells German Diesel Passenger Vehicles, which were purchased by consumers throughout the United States, including in this District during the Class Period. Daimler AG directs the activities of its subsidiaries, which act as its agents in the selling of German Diesel Passenger Vehicles, including throughout the United States during the Class Period.

20.    **Mercedes-Benz USA, LLC**: Defendant Mercedes-Benz USA, LLC is a Delaware limited liability corporation with its principal place of business in Atlanta, Georgia; it designs, develops, manufactures, distributes and sells German Diesel Passenger Vehicles, which were purchased by consumers throughout the United States, including in this District during the Class Period. Mercedes-Benz USA, LLC operates a regional sales office, a parts distribution center, and a customer service center in New Jersey.

21.    **Mercedes-Benz U.S. International, Inc.**: Defendant Mercedes-Benz U.S. International, Inc. is a corporation organized and existing under the laws of Alabama, with its principal place of business in Vance, Alabama; it manufactures Daimler-Mercedes diesel vehicles distributed and sold throughout the United States during the Class Period. Mercedes-Benz U.S. International, Inc. is a wholly-owned subsidiary of Daimler AG. 17. Defendant Mercedes-Benz Vans, LLC is a Delaware limited liability corporation with its principal place of business in Ladson, South Carolina; it also manufactures Daimler-Mercedes diesel vehicles distributed and sold throughout the United States during the Class Period. Mercedes-Benz Vans, LLC is a wholly owned subsidiary of Daimler AG.

22.     Defendants were knowing and active participants in the creation, development, marketing, and sale of supracompetitively priced vehicles in the United States. All vehicles made by any defendant from the mid-1990s to today may be affected.

23.     Defendants not only developed technology in concert and agreed not to compete in certain areas, they schemed to prevent U.S. and European regulators from discovering even a hint of the conspiracy.

24.     During the Class Period, each Defendant acted as an agent, servant, employee, or joint venturer of the other Defendants and in doing the things alleged acted within the course of such agency, employment, or in furtherance of the joint venture to accomplish the scheme. Each Defendant's acts alleged herein was done with the permission and consent of each of the other Defendants. While each of the Defendants are separate legal entities, each Defendant works together under a common identity as portrayed to the public and there is sufficient unity of interest and control between each Defendant such that the acts of one are for the benefit and can be imputed to the acts of the other.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d). The matter in controversy exceeds $5,000,000 exclusive of interest and costs, and this matter is a class action in which certain class members are citizens of States other than each Defendant's state of citizenship. The Court also has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff and the Class have brought claims under the RICO Act, 18 U.S.C. § 1962 and Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

26.     This Court has personal jurisdiction over Plaintiff Gaurav Sharma

because Plaintiff resides in San Diego, California. This Court has personal jurisdiction over each Defendant pursuant to 18 U.S.C. § 1965(b) & (d), and/or California Code of Civil Procedure section 410.10. This Court has personal jurisdiction over Defendants because they have minimum contacts with the United States, this judicial district, and this State, and intentionally availed themselves of the laws of the United States and this state by distributing, testing, selling, leasing, and/or providing warranties for the German Auto Cartel's vehicles in this State and District. At least in part because of Defendants' misconduct as alleged in this Complaint, Class Vehicles ended up on this state's roads and in dozens of dealerships across the state.

27.     Venue is proper in this Court under 28 U.S.C. § 1391 because Defendants advertise, market, lease, and sell a substantial number of automobiles in this District and have dealerships in this District. Venue is also proper in this Court because Defendants caused harm to Class Members residing in this District.

28.     Alternatively, there is jurisdiction over foreign Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

29.     In connection with German diesel vehicles, Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anti-competitive effects upon interstate commerce within the United States, and such conduct gives rise to the claims of Plaintiff and the members of the Class. Also, German diesel passenger vehicles manufactured abroad by Defendants and sold in the United States are goods brought into the United States for sale, and therefore are import commerce.

## SPECIFIC FACTUAL ALLEGATIONS

### The German auto industry begets the German Auto Cartel

30.    The German Auto Cartel can trace its roots to the protectionist policies of Otto von Bismarck in the 1870s.[3] Cartel behavior was encouraged in Germany, as German executives were taught to see their competition in terms of nationality. High tariffs kept international competition out of Germany's own markets, while German industry cartels would work collaboratively to compete globally.

31.    The members of the Germany Auto Cartel have always had a cozy relationship with one another. Modern-day Daimler AG is the oldest member of the German Auto Cartel. Separately, Carl-Friedrich Benz in 1886 and Gottlieb Daimler in 1887 built the first motor vehicles in Germany. Their respective companies merged in 1926.

32.    Audi's origins include the founding of a predecessor company by August Horch, A. Horch & Cie, in 1899. The first Audi vehicle was produced in 1910.

33.    BMW was next to come into existence, with its predecessor aircraft company founded in 1916.

34.    Porsche was founded in 1931. Initially, it developed and consulted on products but did not produce cars under its own name. One of its first major projects came from the German government: to develop a "People's Car" for the masses in Germany—what would become the iconic Volkswagen Beetle. Adolf Hitler became involved in the project in 1934, ordering construction of a new state-run factory and emphasizing that Germans should

---

[3] Leonid Bershidsky, "Germany's Auto Industry is Built on Collusion," *Bloomberg View*, July 31, 2017, https://www.bloomberg.com/view/articles/2017-07-31/germany-s-auto-industry-is-built-on-collusion.

have at least equal access to automobiles as compared to Americans. Mass production of the first Beetles had barely started when World War II began, and production was shifted to emphasize military versions of the vehicle. After the war, the Beetle went on to become one of the best—and longest—selling cars in the world. Yet, Volkswagen owes its own existence to nationalistic and anti-competitive behaviors taken to the extreme.

35.    Audi's current emblem is also a nod to its cartel past, as the four rings represent four auto companies that combined to become Auto Union AG, Chemnitz ("Auto Union"), in 1932. Each member brand continued to sell automobiles under its own name, but collaborated on technology.

36.    Auto Union, in turn, was completely acquired by then-Daimler-Benz in 1959. The interrelatedness continued when, six years later, Volkswagen bought Auto Union from Daimler-Benz.

37.    Porsche and Volkswagen, meanwhile, have always had a close, sometimes unclear, relationship. By way of merger, Volkswagen and Porsche became an integrated automotive group in 2011.

**The German Auto Cartel is exposed**

38.    The first cracks in the armor of the German Auto Cartel were arguably the series of diesel scandals, starting with Volkswagen's infamous "Dieselgate." But the truth came to light when *Der Spiegel* obtained a copy of the brief Volkswagen submitted to the European Commission and German Federal Cartel Office, tattling on its fellow co-conspirators. The resulting article, first published in German on July 21, 2017, was damning:

> The collusion over diesel engines is the most spectacular case, but only one of many in which the five German carmakers may have violated cartel law. **The system of collusion encompassed almost all areas of automobile development**.[4]

---

[4] Dohmen, *supra* note 1.

39.     As more fully detailed below, the German Auto Cartel worked collaboratively to develop technology, established joint technical standards, and agreed not to compete against one another in certain fields of innovation.

40.     In Volkswagen's estimation, there have been more than 1000 meetings in the past five years alone. Working groups among the Cartel included "braking control systems, seating systems, air suspensions, clutches, gasoline engines and diesel engines."

41.     The Cartel was extremely effective, operating since at least the 1990s. Those who sought to compete with the Cartel for the market of European-engineered cars could barely find a toe-hold. Saab was forced to shutter completely. Ford, for example, tried to compete by acquiring the Jaguar and Land Rover brands. Unsatisfied with the brands' performance, Ford sold them to Tata Motors, an Indian corporation.

42.     Some former competitors retreated from the United States market and found it difficult or impossible to return, like Renault. While Fiat and Alfa Romeo have managed to reappear stateside with the assistance of the restructured FCA US LLC (parent: Fiat Chrysler N.A.), they have made no noticeable impact on Defendants' market share.

43.     Another fate awaited other former competitors of the German Auto Cartel: some were swallowed whole by the Cartel. BMW now owns Mini; Volkswagen has Lamborghini and Bentley.

44.     The scope and longevity of the Cartel is astonishing. Antitrust law rewards tattling, as the first to come clean receives the most leniency in fines. While *Der Spiegel* initially reported that Volkswagen was the first to break with the pack, subsequent reports suggest Daimler may have beaten it to the punch.[5]

---

[5] Bershidsky, *supra* note 3.

CLASS ACTION COMPLAINT

**The German Auto Cartel agrees not to compete on urea tank size in diesel vehicles**

45.    While other auto companies have increasingly looked for different approaches to environmentally friendly vehicles, like hydrogen fuel cells, the German Auto Cartel stuck with diesel. Diesel vehicles require a urea mixture to process the emissions from the engine. Audi prepared a study that showed a minimum tank size of 19L was needed to meet U.S. standards. Daimler, Volkswagen, and BMW agreed with the results.

46.    But big tanks would have been expensive, and taken space away from selling points, like fancy stereos or storage space. So, in 2010, the companies agreed to 8L tanks for the European market and 16L tanks for the U.S. market. This agreement was the result of many meetings between the members of the Cartel.

47.    It soon became clear that the smaller tanks were inadequate, resulting in Cartel vehicles being unable to comply with emissions standards. Rather than increasing tank size to accommodate the amount of urea needed—an obvious solution—the Cartel stuck to its conspiracy. Some began using technological cheats to fool regulators into believing their cars were compliant, a decision that would cost the companies dearly when it became publicly known, but that, for many years, allowed them to reap great profits.

48.    The Cartel internally acknowledged its anti-competitive behavior, with Audi warning against "an arms race with regard to tank sizes, which we should continue to avoid at all costs."[6]

49.    Indeed, standardizing tank sizes allowed for the Cartel to focus its resources elsewhere and charge consumers a premium for so-called "eco-friendly" technology.  The companies knowingly agreed to inadequate tank

---

[6] Dohmen, supra note 1.

sizes to the detriment of consumers, the general public, and the planet.

**The German Auto Cartel agrees not to compete on soft-top convertible innovation**

50.    The Cartel exploited similar savings with agreements on soft-top convertible technology. One possible front for innovation was the maximum speed at which a soft top convertible could be safely opened and closed—a soft top that goes up with a push of a button at the first sign of rain while cruising on the highway could be a major selling point for potential buyers.

51.    The Cartel decided not to apply resources there. "No arms race when it comes to speeds," minutes from one of the working group for mechanical attachments' meetings read.

52.    As a result, no soft-top convertibles made by the German Auto Cartel can open or close when the vehicle is moving faster than 55 kilometers per hour.[7]

**The German Auto Cartel agrees to follow joint technical standards**

53.    Another way the Cartel facilitated its own success was by establishing and agreeing to follow joint technical standards for a variety of aspects of vehicle design.[8] "The five manufacturers had jointly established 'technical standards' and had agreed to use 'only certain technical solutions' in new vehicles."[9]

54.    Plaintiff and the Class have been harmed as a result of the Cartel's actions. Members of the Class would not have purchased the Class Vehicles, and/or would have paid substantially less for their vehicle. The loss of value to the Class Vehicles is directly attributable to Defendants' fraudulent and

---

[7] Dohmen, *supra* note 1.

[8] *Id*.

[9] *Id*.

CLASS ACTION COMPLAINT

1    deceptive actions. The value of the Class Vehicles is furthered decreased by

2    this actual harm and also the harm to the brand.

3    ### CLASS ACTION ALLEGATIONS

4        55.    Plaintiffs bring this action as a class action pursuant to Federal

5    Rule of Civil Procedure 23 on behalf of themselves and all others similarly

6    situated.  Plaintiffs seek to represent the following Classes:

7    **Nationwide Class**

8    All persons or entities in the United States who indirectly
     purchased or leased a Class Vehicle[10] from any Defendant
9    during the Class Period.

10   **Alabama Class**

11   All current and former owners of Class Vehicles who
     reside in the State of Alabama and who indirectly
12   purchased or leased Class Vehicles in Alabama during the
     Class Period.

13
     **Arizona Class**
14
     All current and former owners of Class Vehicles who
15   reside in the State of Arizona and who indirectly
     purchased or leased Class Vehicles in Arizona during the
16   Class Period.

17   **California Class**

18   All current and former owners of Class Vehicles who
     reside in the State of California and who indirectly
19   purchased or leased Class Vehicles in California during the
     Class Period.
20
     **District of Columbia Class**
21
     All current and former owners of Class Vehicles who
22   reside in the District of Columbia and who indirectly
     purchased or leased Class Vehicles in D.C. during the
23   Class Period.

24

25

26

27   [10] "Class vehicle" includes all vehicles designed and/or sold by any
     Defendant, including subsidiaries' vehicles, from January 1, 1995 – July 21,
28   2017.

35

### Illinois Class

All current and former owners of Class Vehicles who reside in the State of Illinois and who indirectly purchased or leased Class Vehicles in Illinois during the Class Period.

### Iowa Class

All current and former owners of Class Vehicles who reside in the State of Iowa and who indirectly purchased or leased Class Vehicles in Iowa during the Class Period.

### Kansas Class

All current and former owners of Class Vehicles who reside in the State of Kansas and who indirectly purchased or leased Class Vehicles in Kansas during the Class Period.

### Maine Class

All current and former owners of Class Vehicles who reside in the State of Maine and who indirectly purchased or leased Class Vehicles in Maine during the Class Period.

### Michigan Class

All current and former owners of Class Vehicles who reside in the State of Michigan and who indirectly purchased or leased Class Vehicles in Michigan during the Class Period.

### Minnesota Class

All current and former owners of Class Vehicles who reside in the State of Minnesota and who indirectly purchased or leased Class Vehicles in Minnesota during the Class Period.

### Mississippi Class

All current and former owners of Class Vehicles who reside in the State of Mississippi and who indirectly purchased or leased Class Vehicles in Mississippi during the Class Period.

### Nebraska Class

All current and former owners of Class Vehicles who reside in the State of Nebraska and who indirectly purchased or leased Class Vehicles in Nebraska during the Class Period.

### New Hampshire Class

All current and former owners of Class Vehicles who reside in the State of New Hampshire and who indirectly

purchased or leased Class Vehicles in New Hampshire during the Class Period.

**New Mexico Class**

All current and former owners of Class Vehicles who reside in the State of New Mexico and who indirectly purchased or leased Class Vehicles in New Mexico during the Class Period.

**New York Class**

All current and former owners of Class Vehicles who reside in the State of New York and who indirectly purchased or leased Class Vehicles in New York during the Class Period.

**North Carolina Class**

All current and former owners of Class Vehicles who reside in the State of North Carolina and who indirectly purchased or leased Class Vehicles in North Carolina during the Class Period.

**North Dakota Class**

All current and former owners of Class Vehicles who reside in the State of North Dakota and who indirectly purchased or leased Class Vehicles in North Dakota during the Class Period.

**Oregon Class**

All current and former owners of Class Vehicles who reside in the State of Oregon and who indirectly purchased or leased Class Vehicles in Oregon during the Class Period.

**Rhode Island Class**

All current and former owners of Class Vehicles who reside in the State of Rhode Island and who indirectly purchased or leased Class Vehicles in Rhode Island during the Class Period.

**South Dakota Class**

All current and former owners of Class Vehicles who reside in the State of South Dakota and who indirectly purchased or leased Class Vehicles in South Dakota during the Class Period.

**Tennessee Class**

All current and former owners of Class Vehicles who reside in the State of Tennessee and who indirectly purchased or leased Class Vehicles in Tennessee during

the Class Period.

**Utah Class**

All current and former owners of Class Vehicles who reside in the State of Utah and who indirectly purchased or leased Class Vehicles in Utah during the Class Period.

**Vermont Class**

All current and former owners of Class Vehicles who reside in the State of Vermont and who indirectly purchased or leased Class Vehicles in Vermont during the Class Period.

**West Virginia Class**

All current and former owners of Class Vehicles who reside in the State of West Virginia and who indirectly purchased or leased Class Vehicles in West Virginia during the Class Period.

**Wisconsin Class**

All current and former owners of Class Vehicles who reside in the State of Wisconsin and who indirectly purchased or leased Class Vehicles in Wisconsin during the Class Period.

**Class Period**

On information and belief, the Class Period runs from at least January 1, 1995 – July 21, 2017. Plaintiffs reserve the right to amend this definition

56.     Expressly excluded from the Classes are Defendants and their subsidiaries, affiliates, officers, directors, and employees.

57.     Certification of Plaintiffs' claims for class wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class wide basis using the same evidence as would be used to prove those elements on an individual basis. The proposed Classes are appropriate under Rule 23(a), 23(b), 23(b)(2), or 23(b)(3).

58.     **Numerosity (Rule 23(a)(1))**: The proposed Classes are made up of thousands of persons dispersed throughout California and the nation and joinder is impracticable. The precise number and identity of Class Members

are unknown to Plaintiffs at this time, but can be obtained from Defendants' internal records.

59.    **Commonality (Rule 23(a)(2))**: There are questions of law and fact common to the members of the Classes, which predominate over questions affecting only individual Class members, including:

• Whether Defendants and their co-conspirators engaged in a combination and conspiracy to restrain competition and artificially inflate the price of, and otherwise eliminate or restrain competition concerning their vehicles sold in the United States;

• Whether Defendants engaged in unlawful, unfair or fraudulent business practices;

• Whether Defendants' conduct violated the Sherman Act;

• Whether Defendants' publicized and advertised the technological advancement, competitiveness, environmental friendliness, fuel emission compliance, fuel efficiency and/or performance of the Class Vehicles;

• Whether Defendants acted in concert with one another and aided and abetted one another's fraud;

• Whether Defendants' conduct violates RICO;

• Whether the German Auto Cartel's conduct violated California Business and Professions Code § 17200, *et seq*.;

• Whether Defendants' unlawful, unfair or deceptive practices have harmed Plaintiffs and the Class members;

• Whether Plaintiffs and the members of each Class are entitled to equitable or injunctive relief and,

• Whether Plaintiffs and the members of each Class are entitled to damages, including punitive damages.

60.   **Typicality (Rule 23(a)(3))**: Plaintiffs are members of the Classes and Plaintiffs' claims are typical of the claims of the Classes.

61.   **Adequacy (Rule 23(a)(4))**: Plaintiffs are willing and prepared to serve the Court and the proposed Classes in a representative capacity. Plaintiffs will fairly and adequately protect the interests of the Classes and have no interests adverse to or which conflict with the interests of the other members of the Classes. Plaintiffs have engaged the services of counsel who are experienced in complex class litigation, will adequately prosecute this action, and will assert and protect the rights of and otherwise represent the Plaintiffs and absent Class members.

62.   **Risk of Prejudice from Separate Actions (Rule 23(b)(1)(A))**: The prosecution of separate actions by individual members of the Classes would create a risk of inconsistency and varying adjudications, establishing incompatible standards of conduct for Defendants.

63.   **Equitable Class Relief (Rule 23(b)(2))**: Defendants have acted on grounds generally applicable to the Classes, thereby making declaratory and injunctive relief with respect to the members of the Classes as a whole appropriate. By virtue of the nature of the cartel at issue, the German Auto Cartel harmed Plaintiffs and the Classes for decades without their knowledge.

64.   **Superiority (Rule 23(b)(3))**: A class action is superior to other available means for the fair and efficient adjudication of this controversy. Prosecution of the complaint as a class action will provide redress for individual claims too small to support the expense of complex litigation and reduce the possibility of repetitious litigation.

65.   **Tolling – Discovery Rule**: Plaintiffs and the Class did not, and could not possibly have discovered through the exercise of reasonable diligence, that Defendants were concealing a massive conspiracy that limited competition within the German Auto Cartel. Plaintiffs and the Class first had

any reasonable chance to find out about Defendants' collusion when *Der Spiegel* published its topical report on July 21, 2017. Therefore, any statute of limitations that would otherwise apply have been tolled by the discovery rule.

66. **Fraudulent Concealment**: Defendants' knowing, active concealment of the cartel described in this Complaint also operates to toll any statute of limitations that would otherwise apply in this litigation.

## CLAIMS ON BEHALF OF THE NATIONWIDE CLASS

## Count One

## Violations of Racketeer Influenced and Corrupt Organizations Act (RICO)
## 18 U.S.C. § 1962(c) – (d)

## (On Behalf of Plaintiff and the Nationwide Class against all defendants)

67. Plaintiffs re-allege and incorporate by reference the allegations set forth above.

68. Plaintiffs brings this claim individually and on behalf of the Nationwide Class against all defendants.

69. Defendants are all "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

70. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Section 1962(d), in turn, makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions.

71. For more than two decades, Defendants have conspired to increase their market share and profits at the expense of consumers and in

defiance of basic principles of free market economics. Rather than play fair, the members of the German Auto Cartel agreed *not* to compete with one another on a variety of aspects of vehicle design and technological development. Instead, the ostensible "competitors" collaborated (1) to limit technological advancement and competition between them; (2) to share sensitive product plans and technology; (3) to adopt shared standards; (4) to agree on certain suppliers and manufacturers, among others.

72.   Each member of the German Auto Cartel separately participated in its affairs. In particular, representatives from each named Defendant attended hundreds of meetings spanning decades. Specific examples of conduct in furtherance of the conspiracy include agreeing to limit the speed at which soft top convertibles can open and agreeing to standardize urea tanks in diesel vehicles.

73.   As a result of this conspiracy, the Cartel was able to effectively eliminate competition in the United States while simultaneously saving on costs and continuing to charge consumers a premium.

74.   Those who sought to compete with the Cartel for the market of European-engineered cars could barely find a toe-hold. Saab was forced to shutter completely. Ford, for example, tried to compete by acquiring the Jaguar and Land Rover brands. Unsatisfied with the brands' performance, Ford sold them to Tata Motors, an Indian corporation.

75.   Some former competitors retreated from the United States market and found it difficult or impossible to return, like Renault. While Fiat and Alfa Romeo have managed to reappear stateside with the assistance of the restructured FCA US LLC (parent: Fiat Chrysler N.A.), they have made no noticeable impact on Defendants' market share.

76.   Another fate awaited other former competitors of the German Auto Cartel: some were swallowed whole by the Cartel. BMW now owns

Mini; Volkswagen has Lamborghini and Bentley.

77.    Over the decades the German Auto Cartel went undiscovered, the members were able to increase their market share and profits. They are the largest and most profitable carmakers in the American market for European cars.

78.    Not only were purchasers of defendants' vehicles harmed by paying a supracompetitive price, the public as a whole was harmed when the Cartel agreed to limit the size of AdBlue tanks in diesel vehicles—directly contributing to the scandal known as Dieselgate.

79.    To accomplish their scheme or common course of conduct, Defendants, along with others, had to work together to conceal the truth. Each Defendant was employed by or associated with, and conducted or participated in the affairs of, one or several RICO enterprises (defined below and referred to collectively as the "Enterprise"). The purpose of the Enterprise was to collude to lower costs and competition, share technology, and maximize market share and profit worldwide, all while deceiving consumers and regulators into believing that the cartel's members were actually fiercely competing with each other. The motivation was simple: to increase the RICO Defendants' revenues and profits and minimize their losses in the design, manufacture, distribution and sale of the Class Vehicles and their component parts. As a direct and proximate result of their fraudulent scheme and common course of conduct, Defendants were able to crush their competition in the United States and extract billions of dollars from American consumers over a period of more than twenty years. As explained below, their years-long misconduct violated Sections 1962(c) and (d).

80.    At all relevant times, Defendants, along with other individuals and entities, including unknown suppliers involved in the design, calibration, manufacture, testing, marketing, and sale of the Class Vehicles or the

component parts thereof, operated an association-in-fact enterprise, which was formed for the aforementioned purposes, and through which enterprise they conducted a pattern of racketeering activity under 18 U.S.C. § 1961(4).

81.    At all relevant times, the Enterprise and its component "working groups" constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. § 1961(4), as legal entities, as well as individuals and legal entities associated-in-fact for the common purpose of engaging in Defendants' unlawful profit-making scheme.

82.    The association-in-fact Enterprise consisted of at least the following entities and individuals, and likely others: Volkswagen AG and Volkswagen Group of America, Inc; Audi AG and Audi of America, LLC; Dr. Ing. h.c. F. Porsche AG and Porsche Cars of North America, Inc.; Daimler AG and Mercedes-Benz USA, LLC; and Bayerische Motoren Werke AG and BMW North America, LLC. Each of these is a distinct legal entity, and each knew or recklessly disregarded that the Class Vehicles were the product of collusion and conspiracy.

83.    Working with other members of the Enterprise, executives of Volkswagen AG, Audi AG, Porsche AG, Daimler AG, and BMW AG, along with their subsidiaries, formed "working groups" in order to share competitively sensitive technology, limit technological development, and select suppliers and limit costs, all while maintaining premium prices on their products. They further conspired to cover up each other's violations of the law through emissions cheating and other fraudulent conduct, and to conceal the existence of the conspiracy from legitimate industry groups, government regulators, consumers, and competitors.

84.    At least as to the emissions cheating aspect of the conspiracy, certain suppliers acted as co-conspirators. Robert Bosch GmbH ("Bosch"), another wholly distinct legal entity, worked with Volkswagen, Audi, and

Porsche to develop and implement the "defeat device" by which the "Dieselgate" emissions cheating scheme was implemented. Bosch also supplied diesel engine and emissions controls to Daimler that are the subject of similar accusations.

85.     According to *Der Spiegel*, Bosch even attended some of the meetings of the Enterprise in order to develop and conspire to implement the emissions cheating scheme: after a meeting between Daimler AG, BMW AG, Audi AG, Volkswagen AG, Porsche AG, and Bosch on October 19, 2006, a Volkswagen executive was reported to have said (translated from German): "Everyone wants a limit" on emissions treatment injection "because of the limited size of the urea tanks. Nobody wants the true motivation of this limitation [to reach] the authorities (CARB, EPA)."[11]

86.     *Bild am Sonntag*, meanwhile, reports that internal documents confirm Bosch's attendance as well as coordination between at least Audi and Daimler on the exhaust after-treatment emissions cheating scheme.[12]

87.     The Enterprise reportedly began as early as the mid-1990s, long before the merger of Volkswagen and Porsche. It was not until July 2017 that the scheme was revealed, when *Der Spiegel* reported that Volkswagen had self-reported possible antitrust violations to German regulators, and later reported that Daimler had also self-reported possible violations.

88.     It is unclear which Enterprise member defected first. *Süddeutsche*

---

[11] Frank Dohmen, "Bosch an Absprachen der Autokonzerne beteiligt," *Der Spiegel*, July 28, 2017, http://www.spiegel.de/wirtschaft/unternehmen/bosch-beteiligt-bei-absprachen-von-daimler-bmw-audi-volkswagen-und-porsche-a-1160101.html.
[12] Kayhan Özgenc and Jan-Christopher Wehmeyer, "Bosch an Geheimabsprachen der Autobauer Beteiligt," *Bild am Sonntag*, July 28, 2017.

*Zeitung* claims Daimler self-reported before Volkswagen in this case.[13]

89.     At all relevant times, the Enterprise: (a) had an existence separate and distinct from each Defendant; (b) was separate and distinct from the pattern of racketeering in which Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including Defendants and co-conspirators like Bosch, their executives, and other entities and individuals associated for the common purpose of designing, calibrating, manufacturing, distributing, testing, marketing, and selling the Class Vehicles to consumers in the Nationwide and individual state Classes, and deriving profits and revenues from those activities. Each member of the Enterprise shared in the bounty generated by the enterprise, i.e., by sharing the benefit derived from increased profits generated by the scheme.

90.     The Enterprise functioned by selling vehicles and component parts to the consuming public. Many of these products are legitimate, including automobiles not subject to the diesel emissions cheating aspect of the conspiracy. However, Defendants and their co-conspirators, through their illegal Enterprise, engaged in a pattern of racketeering activity, which involves a fraudulent scheme to increase profits for Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme.

91.     The Enterprise engaged in, and its activities affected, interstate and foreign commerce, because it involved commercial activities across state boundaries, such as the marketing, promotion, advertisement and sale or lease of the Class Vehicles throughout the country, and the receipt of revenue

---

[13] Thomas Fromm, Georg Mascolo, and Klaus Ott, "Daimler kam VW mit Selbstanzeige zuvor," *Süddeutsche Zeitung*, July 24, 2017, http://www.sueddeutsche.de/wirtschaft/exklusiv-daimler-kam-vw-mit-selbstanzeige-zuvor-1.3601190.

from the sale of the same. The communications and meetings by which the Enterprise conducted its scheme took place all over the world, in the United States and abroad. The Enterprise's activities affected consumers worldwide, but directly and perhaps most strongly affected commerce within the United States by removing competing manufacturers from the marketplace and imposing, through unlawful means, impenetrable barriers to entry.

92. Within the Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. This network entailed both formal and informal communications, including in-person meetings of the Enterprise "working groups" and regular email, telephone, and informal in-person communications. The enterprise used this common communication network for the purposes of sharing competitively sensitive technology, limiting technological development, and selecting suppliers and limiting costs, all while maintaining premium prices on their products and concealing each other's wrongdoing.

93. Each participant in the Enterprise had a systematic linkage to each other through corporate ties, contractual relationships, financial ties, and continuing coordination of activities. Through the Enterprise, Defendants functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes of increasing their revenues and market share, and minimizing losses.

94. Defendants participated in the operation and management of the Enterprise by directing its affairs, as described herein. While Defendants participated in, and are members of, the Enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements. Without Defendants' willing participation, the Enterprise's scheme and common

course of conduct would have been unsuccessful.

95.    Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present, because such information lies in the Defendants' and others' hands. Similarly, because Defendants often refer to themselves as a group (i.e, "Volkswagen Group" rather than "Volkswagen AG" or "Volkswagen Group of America"), Plaintiffs cannot fully know the extent of each individual corporate entity's involvement in the wrongdoing prior to having access to discovery.

96.    To carry out, or attempt to carry out the scheme to defraud, Defendants, each of whom is a person associated-in-fact with the Enterprise, did knowingly conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

97.    Specifically, as alleged herein, Defendants have committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343). The multiple acts of racketeering activity that Defendants committed, or aided or abetted the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by Defendants' regular use of the facilities, services, distribution channels, and employees of the Enterprise. Defendants participated in the scheme to defraud by using mail, telephone and the Internet to transmit mailings and wires in interstate or foreign commerce.

98.    Defendants used, directed the use of, and/or caused to be used,

thousands of interstate mail and wire communications into and within the United States in service of their scheme through misrepresentations, concealments and material omissions.

99.    Defendants devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiff and Class members or to obtain money from Plaintiffs and the Nationwide Class by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the illegal scheme, Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

100.    Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

a.    **Mail Fraud**: Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to develop, design, manufacture, market, and sell the Class Vehicles by means of false pretenses, misrepresentations, promises, and omissions.

b.    **Wire Fraud**: Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

101.    Defendants' uses of mail and wires include, but are not limited to, the transmission, delivery, or shipment of the following by Defendants or third parties that were foreseeably caused to be sent as a result of Defendants'

illegal scheme:

   a.   the Class Vehicles themselves;

   b.   component parts of the Class Vehicles that were the subject of collusion between Defendants and co-conspirator suppliers, including Bosch;

   c.   false or misleading emission test results for diesel vehicles and the resulting fraudulently-obtained regulatory certifications;

   d.   false or misleading communications intended to prevent regulators and the public from discovering the true nature of the relationship between Defendants;

   e.   sales and marketing materials, including advertising, websites, packaging, brochures, and labeling, concealing the true relationship between Defendants and the true nature of the Class Vehicles;

   f.   documents intended to facilitate the manufacture and sale of the Class Vehicles, including bills of lading, invoices, shipping records, reports and correspondence;

   g.   documents to process and receive payment for the Class Vehicles by unsuspecting Class members, including invoices and receipts;

   h.   payments to participating suppliers and coconspirators, and millions of dollars in compensation to participating executives; deposits of proceeds;

   i.   and/or other documents and things, including electronic communications.

   102.   Defendants also used the internet and other electronic facilities to carry out the scheme and conceal their ongoing fraudulent activities.

Specifically, Defendants made misrepresentations about the Class Vehicles on their websites, YouTube, and through advertising online, all of which were intended to mislead regulators and the public about technological developments, emission standards, and the true relationships between Defendants.

103.   Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of the scheme.

104.   The mail and wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct to deceive regulators and consumers and lure consumers into purchasing the Class Vehicles.

105.   Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities have been deliberately hidden, and cannot be alleged without access to Defendants' books and records. However, Plaintiff has described the types of predicate acts of mail and/or wire fraud and the period during which they occurred. These include thousands of communications to perpetuate and maintain the scheme, including the types of things and documents described in the preceding paragraphs.

106.   Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the

Defendants and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

107.   Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

108.   To achieve their common goals, Defendants hid from the general public the true nature of their relationship and the true nature of the Class Vehicles. Defendants suppressed and/or ignored warnings from third parties, whistleblowers, and governmental entities about these matters and about the discrepancies in emissions testing and the concealed defeat devices present in certain of the Class Vehicles.

109.   With knowledge and intent, Defendants and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy, and have participated in the common course of conduct, to commit acts of fraud and indecency.

110.   Indeed, for the conspiracy to succeed, each of Defendants and their co-conspirators had to agree to implement and use (or to not use in order to avoid competition between Defendants) the same or similar technology, illicit emissions control devices, and fraudulent tactics.

111.   Defendants knew and intended that United States government regulators, consumers, and competitors would rely on their material misrepresentations and omissions made about the Class Vehicles, about suppliers, about research, development, and technology, and about the relationships between Defendants. Defendants knew and intended that consumers would purchase the Class Vehicles and incur costs as a result.

112.   As described herein, Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of

obtaining significant revenues from Plaintiffs and Class members based on their misrepresentations and omissions. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

113.   The predicate acts had the purpose of generating significant revenue and profits for Defendants at the expense of Plaintiffs and Class members. The predicate acts were committed or caused to be committed by Defendants through their participation in the Enterprise and in furtherance of its unlawful scheme, and were interrelated in that they involved obtaining Plaintiffs' and Class members' funds and avoiding the expenses associated with actual competition in the marketplace through independent research and development in the Class Vehicles.

114.   During the design, manufacture, testing, marketing and sale of the Class Vehicles, Defendants shared among themselves technical, marketing, and financial information that revealed both competitively sensitive technology, and the existence of the unlawful emissions cheating devices contained in certain Class Vehicles. Nevertheless, Defendants chose and agreed to disseminate information that deliberately misrepresented the Class Vehicles and the true relationship between Defendants in their concerted efforts to market and sell Class Vehicles to consumers and remove nearly all alternatives from the market.

115.   By reason of, and as a result of the conduct of Defendants, and in particular, their pattern of racketeering activity, Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to overpayment at the time of purchase or lease for Class Vehicles purportedly having properties and benefits, including cutting-edge proprietary technology and ecologically-friendly "Clean Diesel" technology, that did not have these properties or meet these standards, and

other, ongoing out-of-pocket and loss-of-use expenses.

116.   Defendants' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused economic damage to Plaintiffs' and Class members' business and property, and Plaintiffs and Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c). Members of the Enterprise knew, understood, and intended for members of the Class to purchase the Class Vehicles, and knew, understood, and foresaw that revelation of the truth would injure members of the Class.

## Count Two

### Violations of the Sherman Act, Section 1

### 15 U.S.C. § 1

### (On Behalf of Plaintiffs and the Nationwide Class against all defendants)

117.   Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

118.   Defendants and their co-conspirators entered into a combination and/or conspiracy in restraint of trade, and thereby violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

119.   Specifically, Defendants conspired and agreed to restrain trade and commerce by restricting technological advancement and sharing competitively sensitive technology, by stabilizing and/or restraining research and development and supplier costs, and by artificially inflating and/or stabilizing the prices of the Class Vehicles.

120.   Defendants engaged in numerous anticompetitive activities, as alleged herein, in order to create and undertake this unlawful combination or conspiracy. These activities and acts were done in furtherance of the conspiracy and/or combination in restraint of trade, and were undertaken,

authorized, or ordered by officers, employees, and agents of Defendants while engaged in the management of Defendants' business.

121.   The collusion, conspiracy, and combination between Defendants extended to numerous areas of vehicle development and component parts including but not limited to brakes, suspension, transmissions, electronic systems, mechanical systems such as convertible roofs, and diesel exhaust after-treatment.

122.   These activities were directed at the United States market for European automobiles, and German-engineered vehicles in particular.

123.   This collusion had multiple effects, each compounding the damage to the economy, Plaintiffs, and the Class. Defendants' conspiracy eliminated or substantially reduced competition in the United States market for European-engineered automobiles, leaving limited consumer choice. Not only was competition eliminated or restrained between the German Auto Cartel manufacturers, but the collusion between them eliminated or suppressed competition from other European automakers in the United States.

124.   Defendants' conspiracy or combination in restraint of trade also resulted in benefits to the German Auto Cartel in the form of stabilization or maintenance of price and market share for the Cartel.

125.   Finally, by maintaining premium prices despite the reduced research and development and component part costs for the German Auto Cartel that resulted from their unlawful conspiracy, and by failing to compete among themselves, the Defendants artificially inflated the prices they charged consumers and the profits that resulted.

126.   As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have been injured in their business and property by, among other things, paying supracompetitive prices for their vehicles, and

will continue to be injured if Defendants' conduct is not enjoined.

127. The conspiracy or combination alleged herein constitutes a per se violation of the federal antitrust laws.

128. Plaintiffs and Class members are therefore entitled to injunctive relief against Defendants under the Clayton Act.

## CLAIMS ON BEHALF OF THE STATE CLASSES

### Count Three
### Violation of Alabama's Antitrust Law
### Ala. Code § 6-5-60, *et seq*.
### (On Behalf of Plaintiffs and the Alabama Class against all defendants)

129. Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

130. Under Alabama law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Alabama Code based on the facts alleged in this Complaint.

131. Defendants have entered into an agreement and conspiracy in restraint of trade which violates the antitrust laws of Alabama. Defendants agreed to, and in fact did, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or supracompetitive levels, the prices of German vehicles.

132. During the Class Period, Defendants' conduct substantially affected Alabama's commerce.

133. Class Members purchased German vehicles within the State of Alabama during the Class Period. But for Defendants' conduct set forth herein, the price of Defendants' vehicles would have been lower, in an amount to be determined at trial.

134.   Plaintiffs and members of the Class were injured with respect to purchases of German vehicles in Alabama and are entitled to all forms of relief, including actual damages, treble damages, and interest, reasonable attorneys' fees and costs.

## Count Four

### Violation of Arizona's Uniform State Antitrust Act
### Ariz. Rev. Stat. § 44-1401, *et seq.*

**(On Behalf of Plaintiffs and the Arizona Class against all defendants)**

135.   Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

136.   Defendants have entered into an agreement and conspiracy in restraint of trade which violates Arizona Rev. Stat. § 44-1401, *et seq.*

137.   Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the German vehicle market, a substantial part of which occurred within Arizona.

138.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the German vehicle market, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the German vehicle market.

139.   Defendants flagrantly violated Arizona's laws and their unlawful conduct substantially affected Arizona's trade and commerce.

140.   Members of the Class purchased German vehicles in Arizona at supracompetitive prices as a result of Defendants' conduct.

141.   As a direct and proximate result of Defendants' unlawful conduct, the Plaintiffs and members of the Arizona Class have been injured in their business or property and are threatened with further injury.

142.   By reason of the foregoing, Plaintiffs and members of the Arizona Class are entitled to seek all forms of relief available under Arizona Revised Statute § 44-1401, *et seq.*

## Count Five

### Violation of the Cartwright Act

### Cal. Bus. & Prof. Code § 16700, *et seq.*

### (On Behalf of Plaintiffs and the California Class against all defendants)

143.   Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

144.   Defendants have entered into an agreement and conspiracy in restraint of trade which violates the California Business and Professions Code, § 16700, *et seq.*

145.   Specifically, Defendants conspired and agreed to restrain trade and commerce by restricting technological advancement and sharing competitively sensitive technology, by stabilizing and/or restraining research and development and supplier costs, and by artificially inflating and/or stabilizing the prices of German vehicles.

146.   Defendants engaged in numerous anticompetitive activities, as alleged herein, in order to create and undertake this unlawful combination or conspiracy. These activities and acts were done in furtherance of the conspiracy and/or combination in restraint of trade, and were undertaken, authorized, or ordered by officers, employees, and agents of Defendants while engaged in the management of Defendants' business.

147.   The collusion, conspiracy, and combination between Defendants extended to numerous areas of vehicle development and component parts including but not limited to brakes, suspension, transmissions, electronic systems, mechanical systems such as convertible roofs, and diesel exhaust after-treatment.

148.    These activities were directed at the United States and California market for European automobiles, and German-engineered vehicles in particular.

149.    Defendants' collusion had multiplicative anticompetitive effects. Defendants' conspiracy eliminated or substantially reduced competition in the United States and California market for European-engineered automobiles, leaving limited consumer choice. Not only was competition eliminated or restrained between the German Auto Cartel, but the collusion between them eliminated or suppressed competition from other European automakers in the United States and California.

150.    Defendants' conspiracy or combination in restraint of trade also resulted in the stabilization or maintenance of price and market share between ostensible competitors—the German Auto Cartel.

151.    Finally, by maintaining premium prices despite the reduced research and development and component part costs that resulted from their unlawful conspiracy, and by failing to compete among themselves, the Defendants artificially inflated the prices they charged consumers and the profits that resulted.

152.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members have been injured in their business and property. This constitutes an antitrust injury because Plaintiffs and Class members paid more for Class Vehicles than they would have if Defendants' conduct had been known to the public at the time of purchase or lease. Defendants charged a premium price and exacted inflated profits as a result of their restraint of competition and trade, and consumers had little choice but to pay these premium prices as a result of the restrained and suppressed competition in the marketplace that resulted from Defendants' anticompetitive conduct.

## Count Six

### Violation of the Unfair Competition Act

### Cal. Bus. & Prof. Code § 17200, *et seq.*

### (On Behalf of Plaintiffs and the California Class against all defendants)

153.  Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

154.  Plaintiffs and members of the general public bring this claim pursuant to the "unlawful" prong of Business & Professions Code §§ 17200 *et seq.* ("UCL"), which provides that "unfair competition shall mean and include any unlawful, unfair or deceptive business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter I (commencing with Section 17500) as Part 3 of Division 7 of the Business and Professions Code."

155.  Defendants have violated and continue to violate section 17200's prohibition against engaging in "unlawful" business acts or practices, by, among other things:

- Violating the CLRA, Civil Code section 1750, *et seq.*;
- Violating federal environmental laws, including the Clean Air Act;
- Violating Business & Professions Code section 16700, *et seq.*;
- Violating Business & Professions Code section 17500, *et seq.*; and
- Violating other federal and state law as alleged herein.

156.  Defendants also acted fraudulently and unfairly for purposes of section 17200 by, among other things:

a.    conspiring to share competitively sensitive technology and otherwise limit technological competition and innovation;

b.    conspiring to select component part suppliers and standards, and to set or maintain component part prices, making their untrue representations concerning proprietary engineering;

    c.    conspiring to install emissions-cheating devices in certain Class Vehicles in order to fraudulently pass emissions testing while polluting at many times the legal limit during normal operation, and conspiring to cover up this scheme; and

    d.    falsely advertising and representing the Class Vehicles as possessing qualities— namely, cutting-edge technology and proprietary engineering—that they do not have.

157.   As a result of Defendants' unlawful business acts and practices, Plaintiffs and the Class suffered injury in fact and lost money and/or property. Each class member suffered harm when each was required to pay a purchase price for their Class Vehicles which they never would have purchased if the true facts were known; or paid a price in excess of what a Class member would have paid if Defendants' had accurately disclosed the Class Vehicles' characteristics (or had they engaged in true competition with one another) and in the form of decreased resale value of the Vehicles.

158.   Plaintiffs and the Class are entitled to full restitution and disgorgement of the profits from Defendants' unlawful business practices.

159.   Plaintiffs are also entitled to equitable relief as a result of Defendants' violations of the Business & Professions Code section 17200, *et seq.* Plaintiffs and Class are entitled to such relief in the form of full restitution for the inflated sale price of the Vehicles.

160.   Plaintiffs and the Class also seek an order enjoining Defendants from continuing their unlawful business practices in the future.

## Count Seven

### Violation of the District of Columbia Antitrust Act

### D.C. Code Ann. § 28-4501, *et seq.*

### (On Behalf of Plaintiffs and the District of Columbia Class against all defendants)

161.   Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

162.   The purpose of D.C.'s Antitrust Act is "to promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices."

163.   Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia, and monopolized or attempted to monopolize the German vehicle market within the District of Columbia, in violation of D.C. Code § 28-4501, *et seq.*

164.   Members of the Class purchased German vehicles within the District of Columbia during the Class Period. But for Defendants' conduct set forth herein, the price of Defendants' vehicles would have been lower, in an amount to be determined at trial.

165.   Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this Complaint, because "any indirect purchaser in the chain of manufacture, production or distribution of goods...shall be deemed to be injured within the meaning of this chapter." D.C. Code § 28-4509(a).

166.   Plaintiffs and members of the Class were injured with respect to purchases of German vehicles in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, and interest, reasonable attorneys' fees and costs.

**<u>Count Eight</u>**

**Violation of the Illinois Antitrust Act**

**740 Ill. Comp. Stat. Ann. 10/3(1), *et seq*.**

**(On Behalf of Plaintiffs and the Illinois Class against all defendants)**

167.   Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

168.   The Illinois Antitrust Act, 740 ILCS 10/1, et seq., aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade. . . ." 740 ILCS 10/2.

169.   But for Defendants' conduct set forth herein, the price of Defendants' vehicles would have been lower, in an amount to be determined at trial.

170.   Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 ILCS 10/7(2).

171.   Defendants made contracts or engaged in a combination or conspiracy with each other, though they would have been competitors but for their prior agreement, for the purpose of fixing, controlling or maintaining prices for German vehicles sold, and/or for allocating customers or markets for German vehicles within the intrastate commerce of Illinois.

172.   Defendants further unreasonably restrained trade or commerce and established, maintained or attempted to acquire monopoly power over the market for German vehicles in Illinois for the purpose of excluding competition, in violation of 740 ILCS 10/1, *et seq*.

173.   Members of the Class were injured with respect to purchases of

German vehicles in Illinois and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees and costs.

## Count Nine

### Violation of the Iowa Competition Law

### Iowa Code § 553.1, *et seq.*

### (On Behalf of Plaintiffs and the Iowa Class against all defendants)

174.   Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

175.   The Iowa Competition Law aims to "prohibit[] restraint of economic activity and monopolistic practices." Iowa Code § 553.2.

176.   Defendants contracted, combined or conspired to restrain or monopolize trade in the market for German vehicles, and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing or maintaining prices for German vehicles, in violation of Iowa Code § 553.1, *et seq.*

177.   Members of the Class purchased Defendants' vehicles at supracompetitive prices in Iowa. But for Defendants' conduct, the price of Defendants' vehicles would have been lower, in an amount to be determined at trial.

178.   Plaintiffs and members of the Iowa Class were injured with respect to purchases of German vehicles in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

## Count Ten

### Violation of the Kansas Restraint of Trade Act

### Kan. Stat. Ann. § 50-101 *et seq.*

### (On Behalf of Plaintiffs and the Kansas Class against all defendants)

179.   Plaintiffs re-allege and incorporate by reference each of the

paragraphs set forth above as though fully set forth herein.

180.   The Kansas Restraint of Trade Act aims to prohibit practices which "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state." Kan. Stat. Ann. § 50-112.

181.   Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Kan. Stat. Ann § 50-161(b).

182.   Defendants combined capital, skill or acts for the purposes of creating restrictions in trade or commerce of German vehicles, increasing the price of their vehicles, preventing competition in the sale of German vehicles, or binding themselves not to sell their vehicles, in a manner that established the price of German vehicles and precluded free and unrestricted competition among themselves in the sale of German vehicles, in violation of Kan. Stat. Ann. § 50-101, *et seq.*

183.   Plaintiffs and members of the Class were injured with respect to purchases of German vehicles in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

**Count Eleven**

**Violation of Maine's Antitrust Statute**

**Me. Rev. Stat. Ann. Tit. 10 § 1101, *et seq.***

**(On Behalf of Plaintiffs and the Maine Class against all defendants)**

184.   Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

185.   Part 3 of Title 10 the Maine Revised Statutes generally governs regulation of trade in Maine. Chapter 201 thereof governs monopolies and profiteering, generally prohibiting contracts in restraint of trade and conspiracies to monopolize trade. Me. Rev. Stat. Ann. Tit. 10, §§ 1101-02.

186.   Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Me. Rev. Stat. Ann. Tit. 10, § 1104(1).

187.   Defendants contracted, combined or conspired in restraint of trade or commerce of German vehicles within the intrastate commerce of Maine, and monopolized or attempted to monopolize the trade or commerce of German vehicles within the intrastate commerce of Maine, in violation of Me. Rev. Stat. Ann. Tit. 10, § 1101, *et seq.*

188.   But for Defendants' conduct set forth herein, the price of Defendants' German vehicles would have been lower, in an amount to be determined at trial.

189.   Plaintiffs and members of the Class were injured with respect to purchases of German vehicles in Maine and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' and experts' fees and costs.

## Count Twelve

### Violation of Michigan's Antitrust Reform Act

### Mich. Comp. Laws § 445.771 *et seq.*

### (On Behalf of Plaintiffs and the Michigan Class against all defendants)

190.   Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

191.   The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce...to prohibit monopolies and attempts to monopolize trade or commerce...[and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984.

192.   Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws. § 452.778(2).

193.   Defendants contracted, combined or conspired to restrain or monopolize trade or commerce in the market for German vehicles, in violation of Mich. Comp. Laws § 445.772, *et seq.*

194.   But for Defendants' conduct set forth herein, the price of Defendants' German vehicles would have been lower, in an amount to be proven at trial.

195.   Plaintiffs and members of the Class were injured with respect to purchases of German vehicles in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

## Count Thirteen

### Violation of Minnesota's Antitrust Act

### Minn. Stat. § 325D.49 *et seq.*

### (On Behalf of Plaintiffs and the Minnesota Class against all defendants)

196.   Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

197.   The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination or conspiracy when any part thereof was created, formed, or entered into in Minnesota; any contract, combination or conspiracy, wherever created, formed or entered into; any establishment, maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power, whenever any of these affect Minnesota trade or commerce.

198.   Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.56.

199.   Defendants contracted, combined or conspired in unreasonable

restraint of trade or commerce in the market for German vehicles within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the market for German vehicles within the intrastate commerce of and outside of Minnesota; and fixed prices and allocated markets for German vehicles within the intrastate commerce of and outside of Minnesota, in violation of Minn. Stat. § 325D.49, *et seq*.

200.    Plaintiffs and members of the Class were injured with respect to purchases of German vehicles in Minnesota and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

### Count Fourteen

### Violation of the Mississippi Antitrust Statute

### Miss. Code Ann. § 74-21-1 *et seq*.

### (On Behalf of Plaintiffs and the Mississippi Class against all defendants)

201.    Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

202.    Title 75 of the Mississippi Code regulates trade, commerce and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. Miss. Code Ann. § 75-21-39.

203.    Trusts are combinations, contracts, understandings or agreements, express or implied, when inimical to the public welfare and with the effect of, inter alia, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. Miss. Code Ann. § 75-21-1.

204.   Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. Miss. Code Ann. § 75-21-9.

205.   Defendants combined, contracted, understood and agreed in the market for German vehicles, in a manner inimical to public welfare, with the effect of restraining trade, increasing the price of German vehicles and hindering competition in the sale of German vehicles, in violation of Miss. Code Ann. § 75-21-1(a), *et seq.*

206.   Defendants monopolized or attempted to monopolize the production, control or sale of German vehicles, in violation of Miss. Code Ann. § 75-21-3, *et seq.*

207.   During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

208.   But for Defendants' conduct set forth herein, the price of Defendants' German vehicles would have been lower, in an amount to be determined at trial.

209.   Plaintiffs and members of the Class were injured with respect to purchases of German vehicles in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.

## Count Fifteen

### Violation of the Junkin Act

### Neb. Rev. Stat. § 59-801 *et seq.*

**(On Behalf of Plaintiffs and the Nebraska Class against all defendants)**

210.   Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

211.   Chapter 59 of the Nebraska Revised Statute generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and

monopolization.

212.   Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-821.

213.   Defendants contracted, combined or conspired in restraint of trade or commerce of German vehicles within the intrastate commerce of Nebraska, and monopolized or attempted to monopolize the market for German vehicles within the intrastate commerce of Nebraska by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets and otherwise control trade, in violation of Neb. Rev. Stat. § 59-801, *et seq*.

214.   But for Defendants' conduct set forth herein, the price of Defendants' German vehicles would have been lower, in an amount to be determined at trial.

215.   Plaintiffs and members of the Class were injured with respect to purchases of German vehicles in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

### Count Sixteen

**Violation of New Hampshire's Antitrust Statute**

**N.H. Rev. Stat. Ann. Tit. XXXI, § 356, *et seq*.**

**(On Behalf of Plaintiffs and the New Hampshire Class against all defendants)**

216.   Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

217.   Title XXXI of the New Hampshire Statutes generally governs trade and commerce. Chapter 356 thereof governs combinations and monopolies

and prohibits restraints of trade. N.H. Rev. Stat. Ann. §§ 356:2, 3.

218.   Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. § 356:11(II).

219.   Defendants fixed, controlled or maintained prices for German vehicles, allocated customers or markets for German vehicles, and established, maintained or used monopoly power, or attempted to, constituting a contract, combination or conspiracy in restraint of trade in violation of N.H. Rev. Stat. Ann. § 356:1, *et seq.*

220.   But for Defendants' conduct set forth herein, the price of Defendants' German vehicles would have been lower, in an amount to be determined at trial.

221.   Plaintiffs and members of the Class were injured with respect to purchases of German vehicles in New Hampshire and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.

### Count Seventeen

### Violation of New Mexico's Antitrust Act

### N.M. Stat. Ann. § 57-1-1, *et seq.*

### (On Behalf of Plaintiffs and the New Mexico Class against all defendants)

222.   Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

223.   The New Mexico Antitrust Act aims to prohibit restraints of trade and monopolistic practices. N.M. Stat. Ann. 57-1-15.

224.   Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.M. Stat. Ann. § 57-1-3.

225.   Defendants contracted, agreed, combined or conspired, and

monopolized or attempted to monopolize trade for German Premium Vehicles within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. § 57-1-1, *et seq.*

226.  But for Defendants' conduct set forth herein, the price of Defendants' German vehicles would have been lower, in an amount to be determined at trial.

227.  Plaintiffs and members of the Class were injured with respect to purchases of German vehicles in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

**Count Eighteen**

**Violation of New York Monopolies Law – Section 340**

**N.Y. Gen. Bus. Law § 340, *et seq.***

**(On Behalf of Plaintiffs and the New York Class against all defendants)**

228.  Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

229.  Article 22 of the New York General Business Law general prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. N.Y. Gen. Bus. Law § 340(1).

230.  Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).

231.  Defendants established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of German vehicles and restrained competition in the free exercise of the conduct of the business of German Premium Vehicles within the intrastate commerce of New

York, in violation of N.Y. Gen. Bus. Law § 340, *et seq.*

232.   Plaintiffs purchased German vehicles within the State of New York during the Class Period. But for Defendants' conduct set forth herein, the price of Defendants' German vehicles would have been lower, in an amount to be determined at trial.

233.   Plaintiffs and members of the Class were injured with respect to purchases of German vehicles in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees.

### Count Nineteen

**Violation of N. C. Gen. Stat. - Ch. 75. Monopolies, Trusts & Consumer Protection**
**N.C. Gen. Stat. § 75-1, *et seq.***

**(On Behalf of Plaintiffs and the North Carolina Class against all defendants)**

234.   Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

235.   Defendants entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the German vehicle market, a substantial part of which occurred within North Carolina.

236.   Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the German vehicle market, for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred within North Carolina.

237.   Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

238.   As a direct and proximate cause of Defendants' unlawful conduct, Plaintiff and the members of the North Carolina Class have been injured in

their business or property and are threatened with further injury.

239.   By reason of the foregoing, Plaintiffs and members of the North Carolina Class are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. § 75-1, *et seq.*

## Count Twenty

### Violation of the North Dakota Uniform State Antitrust Act

### N.D. Cent. Code § 51-08.1 *et seq.*

**(On Behalf of Plaintiffs and the North Dakota Class against all defendants)**

240.   Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

241.   The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. N.D. Cent. Code § 51-08.1, *et seq.*

242.   Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. Cent. Code § 51-08.1-08.

243.   Defendants contracted, combined or conspired in restraint of, or to monopolize trade or commerce in the market for German vehicles, and established, maintained, or used a monopoly, or attempted to do so, for the purposes of excluding competition or controlling, fixing or maintaining prices for German vehicles, in violation of N.D. Cent. Code §§ 51-08.1-02, 03.

244.   But for Defendants' conduct set forth herein, the price of Defendants' German vehicles would have been lower, in an amount to be determined at trial.

245.   Plaintiffs and members of the Class were injured with respect to purchases in North Dakota and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief.

## Count Twenty-One

### Violation of Oregon's Antitrust Law

### Or. Rev. Stat. § 646.705, *et seq.*

### (On Behalf of Plaintiffs and the Oregon Class against all defendants)

246.   Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

247.   Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 899 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." Or. Rev. Stat. § 646.715.

248.   Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. Or. Rev. Stat. § 646.780(1)(a).

249.   Defendants contracted, combined, or conspired in restraint of trade or commerce of German vehicles, and monopolized or attempted to monopolize the trade or commerce of German vehicles, in violation of Or. Rev. Stat. § 646.705, *et seq.*

250.   But for Defendants' conduct set forth herein, the price per pound of German vehicles would have been lower, in an amount to be determined at trial.

251.   Plaintiffs and members of the Class were injured with respect to purchases of German vehicles within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

## Count Twenty-Two

### Violation of Rhode Island's Antitrust Act

### R.I. Gen. Laws § 6-36-1, *et seq.*

### (On Behalf of Plaintiffs and the Rhode Island Class against all defendants)

252.   Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

253.   The Rhode Island Antitrust Act aims to promote the unhampered growth of commerce and industry throughout Rhode Island by prohibiting unreasonable restraints of trade and monopolistic practices that hamper, prevent or decrease competition. R.I. Gen. Laws § 636-2(a)(2).

254.   Under the Rhode Island Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. Gen. Laws § 6-36-11(a).

255.   Defendants contracted, combined and conspired in restraint of trade of German vehicles within the intrastate commerce of Rhode Island, and established, maintained or used, or attempted to establish, maintain or use, a monopoly in the trade of German vehicles for the purpose of excluding competition or controlling, fixing or maintaining prices within the intrastate commerce of Rhode Island, in violation of R.I. Gen. Laws § 6-36-1, *et seq.*

256.   But for Defendants' conduct set forth herein, the price of Defendants' German vehicles would have been lower, in an amount to be determined at trial.

## Count Twenty-Three

### Violation of South Dakota's Antitrust Statute

### S.D. Codified Laws § 37-1-3.1 *et seq.*

### (On Behalf of Plaintiffs and the South Dakota Class against all defendants)

257.   Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

258.    Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies and discriminatory trade practices. S.D. Codified Laws §§ 37-1- 3.1, 3.2.

259.    Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. S.D. Codified Laws § 37-1-33.

260.    Defendants contracted, combined or conspired in restraint of trade or commerce of German vehicles within the intrastate commerce of South Dakota, and monopolized or attempted to monopolize trade or commerce of German vehicles within the intrastate commerce of South Dakota, in violation of S.D. Codified Laws § 37-1, *et seq.*

261.    But for Defendants' conduct set forth herein, the price of German vehicles would have been lower, in an amount to be determined at trial.

262.    Plaintiffs and members of the Class were injured with respect to purchases of German vehicles in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

## Count Twenty-Four

### Violation of the Tennessee Trade Practices Act

### Tenn. Code § 47-25-101, *et seq.*

### (On Behalf of Plaintiffs and the Tennessee Class against all defendants)

263.    Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

264.    The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, inter alia, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in

Tennessee. All such arrangements, contracts, agreements, or combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void. Tenn. Code, § 47-25-101.

265.   Under Tennessee law, indirect purchasers (such as the Tennessee Class) have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint.

266.   Defendants competed unfairly and colluded by meeting to fix prices, divide markets, and otherwise restrain trade as set forth herein, in violation of Tenn. Code, § 47-25-101, *et seq*.

267.   Defendant's conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, Defendants' combination or conspiracy had the following effects: (1) price competition for German vehicles was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for German vehicles were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiff and the Tennessee Class were deprived of free and open competition; and (4) Plaintiff and the Tennessee Class paid supra-competitive, artificially inflated prices for German vehicles.

268.   During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce as German vehicles were sold in Tennessee.

269.   The Tennessee Class purchased German vehicles within the State of Tennessee during the Class Period. But for Defendants' conduct set forth herein, the price of German vehicles would have been lower, in an amount to be determined at trial. As a direct and proximate result of Defendants'

unlawful conduct, Plaintiff and the Tennessee Class have been injured in their business and property and are threatened with further injury.

270. Plaintiffs and members of the Tennessee Class were injured with respect to purchases of German Premium Vehicles in Tennessee and are entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.

**Count Twenty-Five**

**Violation of Utah's Antitrust Act**

**Utah Code Ann. § 76-10-911, *et seq*.**

**(On Behalf of Plaintiffs and the Utah Class against all defendants)**

271. Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

272. The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce . . . ." Utah Code Ann. § 76-10-3102.

273. Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).

274. Defendants contracted, combined or conspired in restraint of trade or commerce of German vehicles, and monopolized or attempted to monopolize trade or commerce of German vehicles, in violation of Utah Code Ann. § 76-10-3101, *et seq*.

275. But for Defendants' conduct set forth herein, the price of Defendants' German vehicles would have been lower, in an amount to be determined at trial.

276.    Plaintiffs and members of the Class who are either Utah residents or Utah citizens were injured with respect to purchases of German vehicles in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

## Count Twenty-Six

### Violation of the Vermont Consumer Fraud Act

### Vt. Stat. Ann. tit. 9, § 2451, *et seq.*

### (On Behalf of Plaintiffs and the Vermont Class against all defendants)

277.    Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

278.    The Vermont Consumer Fraud Act ("Vermont CFA") makes unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce." Vt. Stat. Ann. tit. 9, § 2453(a).

279.    Plaintiffs and the Vermont Class have standing under Vermont law as indirect purchasers of German vehicles based on Defendants' conduct alleged herein. Vt. Stat. Ann. tit. 9, § 2465(b).

280.    Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy in unreasonable restraint of trade and commerce and other anticompetitive behavior as alleged above, all in violation of section 2453.

281.    As a result of Defendants' anticompetitive behavior, Plaintiffs and the Vermont Class suffered harm.

282.    Plaintiffs and the Vermont Class are entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]," pursuant to Vt. Stat. Ann. tit. 9, § 2461(b).

## Count Twenty-Seven

**Violation of West Virginia's Antitrust Act**

**W. Va. Code § 47-18-1 *et seq*.**

**(On Behalf of Plaintiffs and the West Virginia Class against all defendants)**

283.   Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

284.   The violations of federal antitrust law set forth above also constitute violations of section 47-18-1 of the West Virginia Code.

285.   During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination, or conspiracy in unreasonable restraint of trade and commerce and other anticompetitive conduct alleged above in violation of W. Va. Code § 47-18-1, *et seq*.

286.   Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

287.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the West Virginia Class have been injured in their business and property in that they paid more for their German vehicles than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 47-18-3 of the West Virginia Antitrust Act, Plaintiffs and members of the West Virginia Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to section 47-18-9 of the West Virginia Code.

# Count Twenty-Eight

## Violation of Wisconsin's Antitrust Act

## Wis. Stat. Ann. § 133.01(01), *et seq.*

### (On Behalf of Plaintiffs and the Wisconsin Class against all defendants)

288.   Plaintiffs re-allege and incorporate by reference each of the paragraphs set forth above as though fully set forth herein.

289.   Chapter 133 of the Wisconsin Statutes governs trust and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." Wis. Stat. § 133.01.

290.   Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. Wis. Stat. 133.18(a).

291.   Defendants contracted, combined or conspired in restraint of trade or commerce of German vehicles, and monopolized or attempted to monopolize the trade or commerce of German vehicles, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. § 133.01, *et seq.*

292.   But for Defendants' conduct set forth herein, the price of Defendants' German vehicles would have been lower, in an amount to be determined at trial.

293.   Plaintiffs and members of the Class were injured with respect to purchases of German vehicles in Wisconsin in that the actions alleged herein substantially affected the people of Wisconsin, with at least thousands of consumers in Wisconsin paying substantially higher prices for Defendants' German vehicles in Wisconsin.

294.   Accordingly, Plaintiffs and members of the Class are entitled to all

forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, prays for relief as follows:

1.  An Order appointing Plaintiffs to represent the proposed California Class and Nationwide Class pursuant to Fed. R. Civ. P. 23(a) and designating their counsel as Class Counsel;

2.  A declaration that any applicable statutes of limitations are tolled as alleged herein;

3.  That the Court find the conduct complained of herein constitutes an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman act; a *per se* violation of Section 1 of the Sherman Act; and an unlawful combination, agreement, understanding, and/or concert of action in violation of state unfair competition and consumer protection laws;

4.  An Order enjoining Defendants from continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

5.  An Order awarding Plaintiffs and the Class restitution and/or disgorgement;

6.  An Order awarding Plaintiffs and the Class compensatory damages;

7.  An Order awarding Plaintiffs and the Class punitive damages;

8.  An Order awarding Plaintiffs and the Class treble damages;

9.   A determination that Defendants are financially responsible for all notice and administration costs;

10.  An Order awarding Plaintiffs attorney's fees, expert witness fees and other costs, including pre-judgment and post-judgment interest thereon to the extent allowed by law; and

11.  Such other relief as the Court deems proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and the proposed Class, hereby demand a trial by jury as to all matters so triable.

Dated:  August 21, 2017

CASEY GERRY SCHENK
FRANCAVILLA BLATT & PENFIELD,
LLP

By:   s/ David S. Casey, Jr.
DAVID S. CASEY, JR.
Attorneys for Plaintiff

CLASS ACTION COMPLAINT